1
2
3
4
5
6
7

LIONEL Z. GLANCY (#134180)
ROBERT V. PRONGAY (#270796)
LESLEY F. PORTNOY (#304851)
CHARLES H. LINEHAN (#307439)
**GLANCY PRONGAY & MURRAY LLP**
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone:   (310) 201-9150
Facsimile:    (310) 201-9160
Email: lportnoy@glancylaw.com

8
9

*Attorneys for Plaintiff*
[Additional Counsel On Signature Page]

10
11

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

12
13
14
15
16
17
18
19
20
21
22

JERRY VINSON, Individually and on
Behalf of All Others Similarly Situated,

                                 Plaintiff,

        vs.

MABVAX THERAPEUTICS
HOLDINGS, J. DAVID HANSEN, and
GREGORY P. HANSON,

                                 Defendants.

Case No.:   **'18 CV 1819 LAB AGS**

**COMPLAINT FOR VIOLATIONS
OF THE FEDERAL SECURITIES
LAWS**

CLASS ACTION

**DEMAND FOR JURY TRIAL**

23
24
25
26
27
28

Plaintiff Jerry Vinson, individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Securities and Exchange Commission ("SEC") filings by MabVax Therapeutics Holdings ("MabVax" or the "Company"), as well as media and analyst reports about the Company and conference all transcripts. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all individuals and/or entities that purchased or otherwise acquired the securities of MabVax between June 30, 2014 and May 18, 2018, inclusive (the "Class Period"), alleging violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act").

2.      MabVax through its subsidiaries develops human antibody-based products and vaccines to address unmet medical needs for the treatment of diseases such as pancreatic, lung, sarcoma ovarian and breast cancer.

3.      On January 30, 2018, the Company filed an 8-K with the SEC disclosing an investigation by the SEC, the Company stated in relevant part:

MabVax Therapeutics Holdings, Inc. (NASDAQ: MBVX) ("MabVax" or the "Company"), a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer, today announced that it received notice that the Securities and Exchange Commission ("SEC") was conducting an investigation and examination pursuant to Section 8(e) of the Securities Act of 1933, as amended, relating to certain of the Company's registration statements (and amendments thereto). The Company intends to cooperate fully with the SEC's examination.

4.     On this news the Company's shares fell $0.47 per share, or nearly 18%, to close at $2.19 per share on January 30, 2018.

5.     Then, on May 21, 2018, the Company filed an 8-K with the SEC disclosing more details regarding the SEC investigation into the Company and its officers and directors' potential violation of federal securities laws, as well as an investigation into potential violations of securities laws by various holders of the Company's securities. The Company stated in relevant part:

> We believe the SEC is investigating (i) potential violations by the Company and its officers, directors and others of Section 10(b) of the Securities and Exchange Act of 1934, as amended (as amended, the "Exchange Act") and Section 17(a) of the Securities Act of 1933, as amended (as amended, the "Securities Act"); and (ii) potential violations by multiple holders of our preferred stock of the reporting and disclosure requirements imposed by Section 13(d) of the Exchange Act and pursuant to Schedules 13D and 13G. We further believe the SEC Investigation pertains to our relationships with multiple of those holders of our preferred stock, including (i) the circumstances under which those stockholders invested in the Company and whether they have acted as an undisclosed group in connection with their investment; (ii) the manner with or in which those stockholders may have sought to control or influence the Company and its leadership since their respective investments (and the extent to which those efforts to control or influence have been

successful); and (iii) our prior disclosures regarding the control of the Company and beneficial ownership of our common and preferred stock included in our registration statements filed in 2017 and 2018 and in our Exchange Act reports. In light of the SEC Investigation, we have also reviewed facts and circumstances related to our recently completed May 2018 offering and publicly available information concerning certain of our stockholders' relationships with other registrants.

We have cooperated with the SEC in connection with the SEC Investigation, and our Board of Directors has appointed a Special Committee comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation. However, we cannot predict when the SEC Investigation will conclude, nor whether it will conclude in a manner adverse to the Company, any of its directors and officers, or its current or former stockholders. We also cannot predict, how the SEC Investigation or any related matters may impact how the Company is perceived by the market, potential partners and potential investors in our securities. We do not believe that the SEC would declare effective any registration statements registering our securities effective during the pendency of the SEC Investigation.

Historically, we have calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of our stockholders, including reports filed on Schedules 13D and 13G and information provided by these stockholders directly to us. We have similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and our review of the matters under investigation (including information learned recently) has raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in the Company. If certain stockholders have indeed acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in our prior beneficial ownership disclosures. If their holdings should have been so aggregated, then, due to the provisions of our organizational documents regarding the conversion limitations applicable to certain holders of our preferred stock, shares of our common stock may have been issued in violation of our

organizational documents. If shares of our common stock were issued in violation of our organizational documents, then the number of shares of our outstanding common stock previously reported in our financial statements, registration statements and Exchange Act Reports may be inaccurate. Further, figures reported and included in our financial statements, registration statements and Exchange Act Reports in reliance on the number of our outstanding shares of common stock, including, but not limited to, our loss per share figures, may also be inaccurate. We are also reviewing our internal and disclosure controls.

6.     On this news the Company's shares fell $0.41 per share or over 23%, to close on May 21, 2018 at $1.36 per share.

7.     Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares, and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

9. The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5. Jurisdiction is confirmed by §27 of the Exchange Act, 15 U.S.C. §78aa.

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

11. Venue is proper in this district pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). The acts and transactions giving rise to the violations of law complained of occurred and certain of MabVax's executive offices are located in this District.

12. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

**PARTIES**

13. Plaintiff Jerry Vinson purchased MabVax common stock during the Class Period as described in the Certification attached hereto and incorporated herein by reference and suffered damages.

14. Defendant MabVax is a Delaware corporation with certain executive offices located in San Diego, California. MabVax's stock trades on the NASDAQ under the ticker MBVX. The Company's Annual Report filed with the SEC on

April 2, 2018 states that 8,961,840 shares of MabVax common stock were issued and outstanding as of April 2, 2018.

15.    Defendant J. David Hansen ("Hansen") is, and was at all relevant times, the Chief Executive Officer ("CEO"), President and Chairman of MabVax.

16.    Defendant Gregory P. Hanson ("Hanson") is, and was at all relevant times, the Chief Financial Officer ("CFO") of MabVax.

17.    During the Class Period, Defendants Hansen and Hanson oversaw the Company's operations and finances. Defendants Hansen and Hanson were intimately knowledgeable about all aspects of MabVax's financial and business operations and were also intimately involved in deciding which disclosures would be made by MabVax. Defendants Hansen and Hanson made various public statements for MabVax during the Class Period, and participated in Class Period investor conferences.

## DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS

18.    The Class Period starts on June 30, 2014, on that date the Company issued a proxy statement on Schedule 14A detailing the terms of the proposed merger between Telik, Inc. and MabVax. Therein, the Company announced the following:

The shares of Telik's common stock held by MabVax's equityholders upon closing of the merger (excluding any shares of Series B preferred stock and the PIPEwarrants (assuming the conversion into common stock of such warrants) issued in the PIPE transaction)

would represent approximately 85%, and shares of Telik's common stock held by Telik's current equityholders are expected to represent approximately 15%, of the Telik capital stock. Including the shares of Series B preferred stock and PIPE warrants (assuming a 1 for 1 conversion into common stock of such warrants) issued in the PIPE transaction, Telik's equity holders other than the holders of the Series B preferred stock and PIPE warrants are expected to hold shares of common stock representing approximately 12% of the Telik capital stock. However, if Telik's common stock is delisted from the NASDAQ Capital Market, MabVax's equity holders will own approximately 95%, and Telik's current equity holders will own approximately 5%, of the Telik capital stock immediately following the merger. At the effective time of the merger, each share of MabVax's common stock will be converted into and exchanged for the right to receive a number of shares of Telik's common stock equal to the exchange ratio calculated in accordance with the merger agreement.

\*\*\*

In 2013, the FDA approved a Phase 3 trial design for Telik's lead drug candidate, Telintra. Because Telik's resources were insufficient to fund further development of Telintra®, in March 2013, Telik engaged Needham & Company, LLC, or Needham, to provide assistance and counsel in identifying and engaging potential investors or strategic partners to advance the Telintra program. During the period from March 2013 to March 10, 2014, Needham contacted approximately 115 potential investors and partners, of which approximately 74 were financial investors and approximately 41 were strategic investors. Telik entered into nondisclosure agreements with 16 of these entities and shared information concerning its research with most of the signatory companies pursuant to the nondisclosure agreements. Of those 16 companies, 10 were financial investors and 6 were strategic investors. Needham's outreach was supplemented by contacts and relationships developed by Telik's management and board, and by Telik's external business development advisor. Discussions with each of the companies contacted focused on financing Telik's potential Phase 3 trial of Telintra that had been approved by the U.S. Food and Drug Administration, licensing arrangements concerning the Telintra program, a business combination, or some blend of the foregoing. Regarding the financial investors, the lack of interest was mostly due

to their perception that Telik's Phase 2 clinical trial data with respect to the study of the oral formulation of Telintra provided insufficient evidence to warrant the financial risk of funding a full Phase 3 clinical trial pursuant to the proposed protocol. Regarding the strategic investors, the lack of interest was mostly due to reasons specific to their strategic priorities.

On February 18, 2014, Telik's counsel received a telephone call from a representative of certain potential investors that later participated in the PIPE transaction, or the Investors, requesting counsel convey to Telik the investors' interest in initiating potential strategic discussions. Telik's counsel conveyed such message to Telik. On February 24, 2014, a representative of Hudson Bay described to Michael M. Wick, Telik's President and Chief Executive Officer, the outline of a potential merger involving an undisclosed, oncology-based biotechnology company and, later that day, representative of Hudson Bay provided to Dr. Wick a form of nondisclosure agreement to enable further discussion.

On February 27, 2014, following a discussion, Telik and Hudson Bay signed a mutual nondisclosure agreement. Later that day, Dr. Wick provided to Hudson Bay a summary of Telik's research programs and business and discussed the summary and proposed merger with a representative of Hudson Bay in greater detail. On March 5, 2014, representatives of Hudson Bay met with J. David Hansen, MabVax's Chief Executive Officer and a founder, and Gregory Hanson, MabVax's Chief Financial Officer, and discussed the potential merger. On the same day, a representative of Hudson Bay introduced Dr. Wick to Messrs. Hansen and Hanson by email.

On March 7, 2014, Dr. Wick spoke with Mr. Hansen by telephone about the potential merger. Each described his respective company, and each agreed to continue the discussion under a nondisclosure agreement. Following the call, Mr. Hansen provided to Dr. Wick a form of nondisclosure agreement between Telik and MabVax that would facilitate further discussion, and the parties signed a mutual nondisclosure agreement later the same day.

On March 13, 2014, Mr. Hansen proposed to Dr. Wick a draft, non-binding term sheet for a possible merger transaction between Telik and MabVax. The termsheet included the structure and certain

preliminary terms of the merger, including equity consideration, the board composition of the combined company, and a potential consulting arrangement with Dr. Wick, as well as exclusivity, termination, expenses, and other customary provisions. The equity consideration in the termsheet proposed that Telik equityholders would hold approximately 12% of the combined company, while MabVax equityholders would receive shares in the merger representing approximately 88%.

On March 14, 2014,Messrs. Hansen and Hanson met in person with Telik's management team at Telik's facility in Palo Alto, California. At this meeting, Mr. Hansen raised the potential that Dr. Wick become a member of the Board of Directors of the proposed new entity should the parties agree on a merger so that Dr. Wick could transfer knowledge of Telintra to the new entity and draw upon his board and oncology development experience to consult with the new entity. Dr. Wick and Mr. Hansen did not discuss compensation for such a Board position, but Dr. Wick presumed that such compensation would be the same as the compensation other directors of the new entity would receive and might include stock options. The March 14 meeting was attended by, on behalf of Telik, Dr. Wick, Steven R. Schow, Telik's Vice President, Research,Wendy K.Wee, Telik's Vice President, Finance and Controller, and William P. Kaplan, Telik's Vice President, General Counsel and Corporate Secretary. At the meeting, Dr. Wick reviewed Telik's business and Telintra development program, and Mr. Hansen reviewed the business and clinical development programs of MabVax. The parties discussed the respective research programs and the general parameters of the potential merger, including the possibility that the combined entity would be able to take advantage of the potential benefits resulting from the combination of the Telik public company infrastructure. Also at the meeting, Dr. Wick informed Messrs. Hansen and Hanson that the equity split was not acceptable to Telik and countered with a proposal in which Telik equityholders would receive approximately 15%, while MabVax equityholders would receive shares representing approximately 85%.

19.     On August 8, 2014, the Company filed its quarterly report, with the SEC, for the period ended June 30, 2014, therein MabVax discussed its internal controls and financing activities, stating in relevant part:

*Evaluation of disclosure controls and procedures.*  Our management, with the participation of our President and Chief Executive Officer and Chief Financial Officer, evaluated the effectiveness of our disclosure controls and procedures as of June 30, 2014. Based on such evaluation, our President and Chief Executive Officer and Chief Financial Officer concluded that, subject to limitations described below, our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended, or the Exchange Act), were effective as of June 30, 2014.

*Changes in internal control over financial reporting.* As discussed above, we completed the Merger on July 8, 2014 and we are currently in the process of evaluating and integrating internal controls over financial reporting of the parties to the Merger. During the quarter ended June 30, 2014, other than the changes to our internal control process resulting from the Merger, there were no changes in our internal controls over financial reporting identified in management's evaluation pursuant to Rule 13a-15(d) of the Exchange Act during the quarter ended June 30, 2014 that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

20.     On November 14, 2014, the Company filed its quarterly report, with the SEC, for the period ended September 30, 2014, therein MabVax discussed its internal controls and financing activities, stating in relevant part:

As required by Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, the Company has evaluated, with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, the effectiveness of its disclosure controls and procedures (as defined in such rules) as of the end of the period covered by this report. Based on our assessment at the end of June 30, 2014, our management concluded that we had a material weakness in

our internal controls over financial reporting. The Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were still not effective as of September 30, 2014 to ensure that information required to be disclosed by the Company in reports prepared in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC") is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

Based on our assessment, our management concluded that we had a material weakness in our internal controls related to our analysis and review of complex accounting transactions, such as the Merger.

Our management, including the Company's Chief Executive Officer and Chief Financial Officer, does not expect that the Company's disclosure controls and procedures will prevent all errors and all fraud. A control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Further, the design of a control system must reflect the fact that there are resource constraints, and the benefits of controls must be considered relative to their costs. Because of the inherent limitations in all control systems, no evaluation of controls can provide absolute assurance that all control issues and instances of fraud, if any, within the Company have been detected. These inherent limitations include the realities that judgments in decision-making can be faulty, and that breakdowns can occur because of simple errors or mistakes.

Additionally, controls can be circumvented by the individual acts of some persons, by collusion of two or more people, or by management override of the control. The design of any system of controls also is based in part upon certain assumptions about the likelihood of future events, and there can be no assurance that any design will succeed in achieving its stated goals under all potential future conditions; over time, controls may become inadequate because of changes in conditions, or the degree of compliance with the policies or procedures may deteriorate. Because of the inherent limitations in a cost-effective control system, misstatements due to error or fraud may occur and not be detected.

Changes in Internal Control over Financial Reporting

As noted above, we identified a material weakness in our internal controls over financial reporting and have taken measures to mitigate the material weakness. In June 2014 we hired an assistant controller to prepare many of the accounting transactions so that the Chief Financial Officer is in a position to timely review the transactions in preparation for issuing the financial statements.

21.    On March 31, 2015, the Company filed its annual report, with the SEC, on Form 10-K, therein the Company discussed its internal controls, stating in relevant part:

Based on their evaluation as of December 31, 2014, our Chief Executive Officer and Chief Financial Officer have concluded that our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended) were not effective.

We made changes in our internal control over financial reporting during the year ended December 31, 2014, that are intended to eliminate a material weakness over the financial reporting on non-routine complex accounting matters such that they are completed in a timely fashion. We also added to the staff three people to help with segregation of duties. Effective December 2014, for any significant material, complex, non-routine event or transaction, the Company retains a third party expert to review the technical memo documenting the accounting treatment for the transaction. Regarding segregation of duties, in June 2014, we added an assistant controller, a person dedicated solely to processing accounts payable, and another person dedicated to reviewing and reporting on clinical trials progress and expenses. These persons have continued to work in these capacities following the Merger; however, not all remediation was in place by December 31, 2014, to eliminate our material weakness.

(II) Management's Report on Internal Control over Financial Reporting

Our management, including our Chief Executive Officer and Chief Financial Officer, does not expect that our procedures or our internal controls will prevent or detect all error and all fraud. An internal control system, no matter how well conceived and operated, can provide only reasonable, not absolute, assurance that the objectives of the control system are met. Because of the inherent limitations in all control systems, no evaluation of our controls can provide absolute assurance that all control issues and instances of fraud, if any, have been detected.

Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2014. In making this assessment, management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission (COSO) in its Internal Control — Integrated Framework (2013). Based on our assessment, our management has concluded that, as of December 31, 2014, our internal control over financial reporting was not effective due to material weakness noted above.

This annual report does not include an attestation report of the company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not subject to attestation by the company's independent registered public accounting firm pursuant to rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report.

22.    On May 15, 2015, the Company filed its quarterly report with the SEC on Form 10-Q for the period ended March 31, 2015, therein the Company discussed its internal controls and financing activities, stating in relevant part:

As required by Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, the Company has evaluated, with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, the effectiveness of its disclosure controls and procedures (as defined in such rules) as of the end of the period covered by this report. The Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures are not effective as of March 31, 2015, to ensure that

information required to be disclosed by the Company in reports prepared in accordance with the rules and regulations of the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

Based on our assessment, our management concluded that we continued to have a material weakness in our internal controls related to segregation of duties and recording of complex accounting transactions for the period ended March 31, 2015.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Changes in Internal Control over Financial Reporting

As required by Rule 13a-15(d) of the Exchange Act, our management, including our principal executive officer and our principal financial officer, conducted an evaluation of the internal control over financial reporting to determine whether any changes occurred during the period covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, our principal executive officer and principal financial officer concluded there were no changes in our internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that could significantly affect internal controls over financial reporting during the quarter ended March 31, 2015.

However, as noted above, we identified a material weakness in our internal controls over financial reporting and have taken measures to mitigate the material weakness. In June 2014 we hired an assistant controller to prepare many of the accounting transactions so that the Chief Financial Officer is in a position to timely review the

transactions in preparation for issuing the financial statements. In April 2015 the assistant controller was promoted to controller and we hired a Senior Director of Finance to take over some of the responsibilities of the controller and Chief Financial Officer, so that the Chief Financial Officer is able to perform review functions on significant transactions on a going forward basis.

\*\*\*

On March 31, 2015 and April 10, 2015, the Company closed on a financing transaction by entering into separate subscription agreements (the "Subscription Agreements") with accredited investors (the "Investors") relating to the issuance and sale of an aggregate of $11,714,501 of units (the "Units") at a purchase price of $0.75 per Unit, with each Unit consisting of one share of the Company's common stock, par value $0.01 per share (or, at the election of any Investor who, as a result of receiving common stock would hold in excess of 4.99% of the Company's issued and outstanding common stock, shares of the Company's newly designated 0% Series E Convertible Preferred Stock and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share, as further described in the Notes to Financial Statements – Equity, (the "Private Placement").

23. On August 10, 2015, MabVax filed its quarterly report, with the SEC, for the period ended June 30, 2015, therein the Company provided details on its internal controls and financing activities, stating in relevant part:

As required by Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, the Company has evaluated, with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, the effectiveness of its disclosure controls and procedures (as defined in such rules) as of the end of the period covered by this report. The Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of June 30, 2015, to ensure that information required to be disclosed by the Company in reports prepared in accordance with the rules and regulations of the SEC is

recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

Based on our assessment, our management concluded that we continued to have a material weakness in our internal controls related to segregation of duties and recording of complex accounting transactions for the period ended June 30, 2015.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Changes in Internal Control over Financial Reporting

As required by Rule 13a-15(d) of the Exchange Act, our management, including our principal executive officer and our principal financial officer, conducted an evaluation of the internal control over financial reporting to determine whether any changes occurred during the period covered by this Quarterly Report on Form 10-Q that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, our principal executive officer and principal financial officer concluded there were no changes in our internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that could significantly affect internal controls over financial reporting during the quarter ended June 30, 2015.

However, as noted above, we identified a material weakness in our internal controls over financial reporting and have taken measures to mitigate the material weakness. In June 2014 we hired an assistant controller to prepare many of the accounting transactions so that the Chief Financial Officer is in a position to timely review the transactions in preparation for issuing the financial statements. In April 2015 the assistant controller was promoted to controller and we

hired a Senior Director of Finance to take over some of the responsibilities of the controller and Chief Financial Officer, so that the Chief Financial Officer is able to perform review functions on significant transactions on a going forward basis.

***

MabVax Common Stock Financing

On March 31, 2015, the Company entered into the Private Placement and sold $4,714,726 of Units, net of $281,023 in issuance costs, consisting of 6,661,000 shares of common stock and warrants to purchase 3,330,500 shares of common stock at $1.50 a share. The Units were sold at a price of $0.75 per Unit.

On April 10, 2015, the Company completed the closing of the Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of investment consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 between March 25, 2015, and April 10, 2015, in connection with the Private Placement. OPKO Health, Inc. ("OPKO") was the lead investor in the Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock. As a condition to the Series E preferred stock investment in the Private Placement, each of the other investors in the Private Placement agreed to execute the Lockup Agreement in favor of the Company, restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the Private Placement.

On April 10, 2015, the Company agreed that $3.5 million of the net proceeds of such closing would be paid into and held under and the terms of an escrow agreement with Signature Bank, N.A pending the approval of a representative of OPKO or 10 weeks thereafter, unless released sooner or extended by the representative. In connection with the OPKO investment, Steven Rubin, Esq. was appointed advisor to the Company. The escrowed funds were to be returned to the

applicable investors and the Company shall have no further obligation to issue Units to such investors in the event certain release conditions are not met. On June 30, 2015 the Company and the representative entered into a letter agreement pursuant to which the Company granted the representative the right, but not the obligation, until June 30, 2016, to nominate and appoint up to two additional members of the Company's board of directors (the "Board"or the "Board of Directors"), or to approve the person(s) nominated by the Company pursuant to the agreement in consideration for the release of the escrowed funds. The nominees will be subject to the satisfaction of standard corporate governance practices and any applicable national securities exchange requirements. Upon signing the agreement, the escrowed funds were released to the Company.

For purchasers who would hold 5% or more of the Company's common stock by entering into the Private Placement, they were entitled to elect instead of common stock, shares of the Company's Series E Convertible preferred stock, par value $0.01 per share (the "Series E preferred stock") convertible into an equivalent number of shares of such common stock.

The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

In connection with the Private Placement, the Company also entered into a Registration Rights Agreement with the investors in the Private Placement Pursuant to which the Company has agreed to file a registration statement with the SEC covering resales of up to 25% of common stock issued under the Subscription Agreements and shares issuable upon conversion of the Series E preferred stock, in the event the investors elect to receive Series E preferred stock instead of common stock (together, the "Registrable Securities"), no later than 60 days following the final closing date of the Private Placement, and

to use its commercially reasonable best efforts to have such registration statement declared effective with 120 days after filing. The Company will bear all expenses of such registration of the resale of the Registrable Securities. Investors in the Private Placement also may be required under certain circumstances to agree to refrain from resales of a percentage of their securities upon request of an underwriter or placement agent in a future offering. The liquidated damages for failure to achieve effectiveness of the Registerable Securities is 1% a month 120 days after filing, and provided management has not used commercially reasonable best efforts to have the registration statement declared effective within that timeframe.

24.    On October 30, 2015, MabVax filed its quarterly report, with the SEC, for the period ended September 30, 2015, therein the Company provided details on its internal controls and financing activities, stating in relevant part:

As required by Rules 13a-15 and 15d-15 of the Securities Exchange Act of 1934, the Company has evaluated, with the participation of management, including the Chief Executive Officer and the Chief Financial Officer, the effectiveness of its disclosure controls and procedures (as defined in such rules) as of the end of the period covered by this report. The Chief Executive Officer and Chief Financial Officer concluded that the Company's disclosure controls and procedures were not effective as of September 30, 2015, to ensure that information required to be disclosed by the Company in reports prepared in accordance with the rules and regulations of the SEC is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms.

Based on our assessment, our management concluded that we continued to have a material weakness in our internal controls related to segregation of duties and recording of complex accounting transactions for the period ended September 30, 2015.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Projections of any evaluation of effectiveness to future periods are subject to the risk that

controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate. Management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving their objectives and management necessarily applies its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

Changes in Internal Control over Financial Reporting
As required by Rule 13a-15(d) of the Exchange Act, our management, including our principal executive officer and our principal financial officer, conducted an evaluation of the internal control over financial reporting to determine whether any changes occurred during the three months ended September 30, 2015 that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting. Based on that evaluation, our principal executive officer and principal financial officer concluded there were no changes in our internal controls over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act) that could significantly affect internal controls over financial reporting during the quarter ended September 30, 2015.

However, as noted above, we identified a material weakness in our internal controls over financial reporting and have taken measures to mitigate the material weakness. In June 2014, we hired an assistant controller to prepare many of the accounting transactions so that the Chief Financial Officer is in a position to timely review the transactions in preparation for issuing the financial statements. In April 2015, the assistant controller was promoted to controller and we hired a Senior Director of Finance to take over some of the responsibilities of the controller and Chief Financial Officer, so that the Chief Financial Officer is able to perform review functions on significant transactions on a going forward basis. In July 2015, we hired a Staff Accountant further enabling us to enhance controls by segregating certain additional responsibilities within the accounting function.

***

MabVax Common Stock Financing
On March 31, 2015, the Company consummated the first closing of the April 2015 Private Placement and sold $4,714,726 of Units, net of

$281,023 in issuance costs, consisting of 6,661,000 shares of common stock and warrants to purchase 3,330,500 shares of common stock at $1.50 a share. The Units were sold at a price of $0.75 per Unit.

On April 10, 2015, the Company consummated the second and final closing of the April 2015 Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of i consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 in the April 2015 Private Placement. OPKO was the lead investor in the April 2015 Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock. As a condition to OPKO's participation in the April 2015 Private Placement, each of the other investors in the April 2015 Private Placement agreed to execute lockup agreements restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the April 2015 Private Placement.

On April 10, 2015, the Company agreed that $3.5 million of the net proceeds of such closing would be paid into and held under the terms of an escrow agreement with Signature Bank, N.A pending the approval of a representative of OPKO or 10 weeks thereafter, unless released sooner or extended by the Company and OPKO. On June 22, 2015 the Company and OPKO extended the termination date of the escrow to 16 weeks from the final closing of the April 2015 Private Placement. In connection with the OPKO investment, Steven Rubin, Esq. was appointed advisor to the Company. The escrowed funds were to be returned to the applicable investors and the Company shall have no further obligation to issue Units to such investors in the event certain release conditions are not met. On June 30, 2015 the Company and OPKO entered into a letter agreement pursuant to which the Company granted the representative the right, but not the obligation, until June 30, 2016, to nominate and appoint up to two additional members of the Company's Board, or to approve the person(s)

nominated by the Company pursuant to the agreement in consideration for the release of the escrowed funds. The nominees will be subject to the satisfaction of standard corporate governance practices and any applicable national securities exchange requirements. Upon signing the agreement, the escrowed funds were released to the Company.

The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

In connection with the Private Placement, the Company also entered into a Registration Rights Agreement with the investors in the Private Placement Pursuant to which the Company has agreed to file a registration statement with the SEC covering resales of up to 25% of common stock issued under the Subscription Agreements and shares issuable upon conversion of the Series E preferred stock, in the event the investors elect to receive Series E preferred stock instead of common stock (together, the "Registrable Securities"), no later than 60 days following the final closing date of the Private Placement, and to use its commercially reasonable best efforts to have such registration statement declared effective with 120 days after filing. The Company will bear all expenses of such registration of the resale of the Registrable Securities. Investors in the Private Placement also may be required under certain circumstances to agree to refrain from resales of a percentage of their securities upon request of an underwriter or placement agent in a future offering. The liquidated damages for failure to achieve effectiveness of the Registerable Securities is 1% a month 120 days after filing, and provided management has not used commercially reasonable best efforts to have the registration statement declared effective within that timeframe.

In connection with the April 2015 Private Placement, the Company also entered into a registration rights agreements (the "Registration Rights Agreements") with the investors in the April 2015 Private Placement Pursuant to which the Company has agreed to file a registration statement with the SEC covering resales of up to 25% of common stock issued under the Subscription Agreements and shares issuable upon conversion of the Series E preferred stock, in the event the investors elect to receive Series E preferred stock instead of common stock (together, the "Registrable Securities"), no later than 60 days following the final closing date of the April 2015 Private Placement, and to use its commercially reasonable best efforts to have such registration statement declared effective with 120 days after filing. The Company will bear all expenses of such registration of the resale of the Registrable Securities. Investors in the Private Placement also may be required under certain circumstances to agree to refrain from resales of a percentage of their securities upon request of an underwriter or placement agent in a future offering. The liquidated damages for failure to achieve effectiveness of the Registerable Securities is 1% a month 120 days after filing, and provided management has not used commercially reasonable best efforts to have the registration statement declared effective within that timeframe.

On June 9, 2015 the Company and investors holding over 60% of the outstanding Registrable Securities (as such term is defined in the Registration Rights Agreements) entered into an amendment agreement to the Registration Rights Agreements in order to: (i) amend the definition of "Filing Date"for the initial registration statement such that such term shall be defined as "August 5, 2015"and (ii) waive any payments that may be due to the Investors as a result of the Company not filing a registration statement on or before the Filing Date, as such term was originally defined. On August 4, 2015, the Company and Investors holding over 70% of the outstanding Registrable Securities entered into a second amendment agreement to further extend the Filing Date to October 9, 2015.

On October 12, 2015, the Company and Investors holding over 60% of the outstanding Registerable Securities (as such term is defined in the Registration Rights Agreements) entered into a third amendment agreement to the Registration Rights Agreements to suspend the Company's registration obligations under the Registration Rights

Agreements and related subscription agreements during any period when the "Standstill" provision set forth in 5(u) of the subscription agreements is in effect.

Except for certain issuances, for a period beginning on the closing date of the April 2015 Private Placement and ending on the date that is the earlier of (i) 24 months from the final closing date of the April 2015 Private Placement, (ii) the date the Company consummates a financing (excluding proceeds from the April 2015 Private Placement) in which the Company receives gross proceeds of at least $10,000,000 and (iii) the date the common stock is listed for trading on a national securities exchange (such period until the earlier date, the "Price Protection Period"), in the event that the Company issues any shares of common stock or securities convertible into common stock at a price per share or conversion price or exercise price per share that is less than $0.75, the Company shall issue to the investors in the April 2015 Private Placement such additional number of shares of common stock such that the investor shall own an aggregate total number of shares of common stock as if they had purchased the Units at the price of the lower price issuance.

No adjustment in the warrants is required in connection with a lower price issuance. The Company has also granted each investor prior to the expiration of 24 months following the final closing date of the April 2015 Private Placement, a right of participation in the Company's financings.

In the event the Company conducts certain private or public offerings of its securities, each investor has agreed, if requested by the underwriter or placement agent so engaged by the Company in connection with such offering, to refrain from selling any securities of the Company for a period of up to 60 days.

Between April 13, 2015, and April 14, 2015, certain holders of warrants issued in the April 2015 Private Placement to purchase an aggregate of 1,849,999 shares of common stock exercised such warrants on a cashless basis for an aggregate issuance of 1,219,780 shares of common stock. As of September 30, 2015, there were 5,959,668 warrants outstanding to purchase common stock at $1.50 a share.

CLASS ACTION COMPLAINT
24

25.    On March 14, 2016, MabVax filed its annual report for the period ended December 31, 2015, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

Financing Activities
Oxford Loan –On January 15, 2016, we entered into a Loan and Security Agreement with Oxford Finance LLC providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement.
Underwritten Offering –On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 2,500,000 shares of our common stock and 1,250,000 three-year warrants to purchase 1,250,000 shares of our common stock at an initial exercise price of $1.32 per share. The shares of common stock were sold at a public offering price of $1.10 per share and the warrants were sold at a price of $0.01 per warrant. The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

April Private Placement –On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $0.75 per unit, with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Preferred Shares) and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share (such sale and issuance, the "April Private Placement,"or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015 in which we sold an aggregate of $4,995,750 of units. Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into

separate subscription agreements for the sale of an additional $6,718,751 of units.

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at Signature Bank. The escrowed funds were released us on June 30, 2015 as part of a letter agreement giving OPKO the right, but not the obligation, until June 30, 2016, to nominate and have appointed up to two additional members of the our Board of Directors, or to approve the person(s) nominated by the Company. The nominees will be subject to satisfaction of standard corporate governance practices and any applicable national securities exchange requirements.

Preferred and Warrant Holders Common Stock Exchange Agreements –On March 25, 2015, we entered into separate exchange agreements (collectively, the "Exchange Agreements") with certain holders of our Series A-1 Preferred Stock and A-1 Warrants and holders of our Series B Preferred Stock and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 2,537,502 shares of our common stock and an aggregate of 238,156 shares of our newly designated Series D Convertible Preferred Stock (collectively the "Exchange Securities").

\*\*\*

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2015, our internal control over financial reporting was effective.

26.     On March 1, 2017, the Company MabVax filed its annual report for the period ended December 31, 2016, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

> August Public Offering –On August 22, 2016, we closed a public offering of 1,297,038 shares of common stock and 665,281 shares of Series F Convertible Preferred Stock ("Series F Preferred Stock"), and warrants to purchase 1,962,319 shares of common stock at $5.55 per share and warrants to purchase 1,962,319 shares of common stock at $6.29 per share, at an offering price of $4.81 per share. For every one share of common stock or Series F Preferred Stock sold, we issued one warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock, warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock at $6.29 per share. We received $9,438,753 in gross proceeds, before underwriting discounts and commissions and offering expenses totaling $871,305.
>
> Oxford Loan –On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the "Load and Security Agreement") providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. The option to draw the second $5,000,000 expired on September 30, 2016.
>
> Underwritten Offering –On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 337,838 shares of our common stock and 168,919 three-year warrants to purchase 168,919 shares of our common stock at an initial exercise price of $9.77 per share (all numbers adjusted for the Listing Reverse Split). The shares of common stock were sold at a public offering price of $8.14 per share and the warrants were sold at a price of $0.01 per warrant (adjusted for the Listing Reverse Split). The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

April Private Placement –On March 31, 2015 and April 10, 2015, we entered into separate subscription agreements with accredited investors relating to the issuance and sale of $11,714,498 of units at a purchase price of $5.55 per unit (adjusted for the Listing Reverse Split), with each unit consisting of one share of common stock (or, at the election of any investor who, as a result of receiving common stock would hold in excess of 4.99% of our issued and outstanding common stock, shares of our newly designated Series E Convertible Preferred Stock ("Series E Preferred Stock")) and a thirty-month warrant to purchase one half of one share of common stock at an initial exercise price of $11.10 per share (adjusted for the Listing Reverse Split), such sale and issuance, the "April Private Placement,"or the "Private Placement"). We conducted an initial closing of the April Private Placement on March 31, 2015, in which we sold an aggregate of $4,995,750 of units.

Following the initial closing we entered into separate reconfirmation agreements with the investors in order to extend the initial closing date, increase the offering amount, and adopt a lockup agreement which was entered into by all investors who elected to continue their investment. A second closing was held on April 10, 2015 in which we entered into separate subscription agreements for the sale of an additional $6,718,751 of units.

On April 14, 2015, as a condition to participation by OPKO Health, Inc. ("OPKO") and Frost Gamma Investments Trust ("FGIT") in the April Private Placement, we entered into an Escrow Deposit Agreement with Signature Bank N.A. and OPKO, as amended on June 22, 2015, pursuant to which $3.5 million from the April Private Placement was deposited into and held at Signature Bank. The escrowed funds were released to us on June 30, 2015, as part of a letter agreement giving OPKO the right, but not the obligation until June 30, 2016, to nominate and have appointed up to two additional members of our Board of Directors, or to approve the person(s) nominated by the Company. The nominees selected were required to meet certain standard corporate governance practices and applicable national securities exchange requirements.

Preferred and Warrant Holders Common Stock Exchange Agreements –On March 25, 2015, we entered into separate exchange agreements

(collectively, the "Exchange Agreements") with certain holders of our Series A-1 Convertible Preferred Stock ("Series A-1 Preferred Stock") and A-1 Warrants and holders of our Series B Convertible Preferred Stock ("Series B Preferred Stock") and Series B Warrants, all previously issued by us. Pursuant to the Exchange Agreements, the holders exchanged their respective preferred shares and warrants and relinquished any and all other rights they may have pursuant to such securities, their respective governing agreements and certificates of designation, including any related registration rights, in exchange for an aggregate of 342,906 shares of our common stock (adjusted for the Listing Reverse Split) and an aggregate of 238,156 shares of our newly designated Series D Convertible Preferred Stock ("Series D referred Stock"and, collectively, the "Exchange Securities").

***

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commis s ion. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2016, our internal controls over financial reporting were effective.

**The Truth Partially Disclosed**

27.    The statements referenced above in ¶¶ 18 & 19 were materially false and/or misleading when made because Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and

Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

## The Truth Partially Revealed

28.    On January 30, 2018, the Company filed an 8-K with the SEC disclosing an investigation by the SEC, the Company stated in relevant part:

> MabVax Therapeutics Holdings, Inc. (NASDAQ: MBVX) ("MabVax" or the "Company"), a clinical-stage biotechnology company focused on the development of antibody-based products to address unmet medical needs in the treatment of cancer, today announced that it received notice that the Securities and Exchange Commission ("SEC") was conducting an investigation and examination pursuant to Section 8(e) of the Securities Act of 1933, as amended, relating to certain of the Company's registration statements (and amendments thereto). The Company intends to cooperate fully with the SEC's examination.

29.    On this news the Company's shares fell $0.47 per share, or nearly 18%, to close at $2.19 per share on January 30, 2018.

30.    On April 2, 2018, the Company MabVax filed its annual report for the period ended December 31, 2017, therein the Company discussed its "Financing Activities" and the effectiveness of MabVax's internal controls, stating in relevant part:

> **Conversion of Preferred Stock into Common Stock**
> During 2017 holders of Series D Preferred Stock converted 88,384 shares into 398,131 shares of common stock, holders of Series I Preferred Stock converted 1,170,204 shares into 390,068 shares of common stock, holders of Series J Preferred Stock converted 1,614 shares into 537,874 shares of common stock and holders of Series K Preferred Stock converted 1,850 shares into 61,667 shares of common stock.

**Exchange of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock into Series L Preferred Stock**

On October 18, 2017, we entered into exchange agreements (each, an "Exchange Agreement"and collectively, the "Exchange Agreements") with the holders of all of the Company's outstanding shares of Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock, pursuant to which 665,281 shares of Series F Preferred Stock, 1,000,000 shares of Series G Preferred Stock and 850 shares of Series H Preferred Stock were exchanged for 58,000 newly authorized shares of Series L Preferred Stock convertible into 3,222,223 shares of common stock (the "Conversion Shares"). In connection with the Exchange Agreement the Company became obligated to schedule and hold a special meeting of the stockholders of the Company within 60 days of the date of signing the Exchange Agreement, at which time the Company shall present to its stockholders a proposal for approval of the potential issuance of up to an aggregate of 3,222,223 shares of common stock, in excess of 19.99% of the number of shares of common stock that were issued and outstanding on October 17, 2017, upon the conversion of 58,000 shares of the Series L Preferred Stock issued to the holders pursuant to the Exchange Agreements. On December 1, 2017, the stockholders approved the number of shares underlying the Series L Preferred Stock upon conversion.

On December 21, 2017, following the completion of the exchange of Series L Preferred Stock for all outstanding Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock and related documentation, The Company filed with the Secretary of State of the State of Delaware a Certificates of Elimination eliminating from its Amended and Restated Certificate of Incorporation the designation of shares of its preferred stock as Series F Preferred Stock, Series G Preferred Stock and Series H Preferred Stock. As a result, all shares of preferred stock previously designated as Series F, Series G and Series H Preferred Stock were eliminated and returned to the status of authorized but unissued shares of preferred stock, without designation.

**Series D Preferred Stock**

As of December 31, 2017 and 2016, there were 44,104 and 132,489 shares of Series D Preferred Stock issued and outstanding, respectively. Shares outstanding as of December 31, 2017 and 2016

were convertible into 198,667 and 596,798 shares of common stock, respectively.

As contemplated by the exchange agreements and as approved by the Company's Board of Directors, the Company filed with the Secretary of State of the State of Delaware a Certificate of Designation of Preferences, Rights and Limitations of Series D Convertible Preferred Stock (the "Series D Certificate of Designations"), on March 25, 2015. Pursuant to the Series D Certificate of Designations, the Company designated 1,000,000 shares of its blank check preferred stock as Series D Preferred Stock. Each share of Series D Preferred Stock has a stated value of $0.01 per share. In the event of a liquidation, dissolution or winding up of the Company, each share of Series D Preferred Stock will be entitled to a per share preferential payment equal to the par value. Each share of Series D Preferred Stock is convertible into 4.5045 shares of common stock. The conversion ratio is subject to adjustment in the event of stock splits, stock dividends, combination of shares and similar recapitalization transactions. The Company is prohibited from effecting the conversion of the Series D Preferred Stock to the extent that, as a result of such conversion, the holder beneficially would own more than 4.99% (provided that certain investors elected to block their beneficial ownership initially at 2.49% in the exchange agreements ), in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the conversion of the Series D Preferred Stock. Each share of Series D Preferred Stock entitles the holder to vote on all matters voted on by holders of common stock. With respect to any such vote, each share of Series D Preferred Stock entitles the holder to cast such number of votes equal to the number of shares of common stock such shares of Series D Preferred Stock are convertible into at such time, but not in excess of the beneficial ownership limitations.

**Series E Preferred Stock**
As of December 31, 2017, and 2016, there were 33,333 shares of Series E Preferred Stock issued and outstanding, convertible into 173,251 shares of common stock.

On March 30, 2015, the Company filed with the Secretary of State of the State of Delaware a Certificate of Designation of Preferences,

Rights and Limitations of Series E Convertible Preferred Stock (the "Series E Certificate of Designations") to designate 100,000 shares of its blank check preferred stock as Series E Preferred Stock.

The shares of Series E Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of such preferred share, plus all accrued and unpaid dividends, if any, on such share of Series E Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series E Preferred Stock is $75 and the initial conversion price is $16.65 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. In addition, during the period proscribed for in the Series E Certificate of Designations, in the event the Company issues or sells, or is deemed to issue or sell, shares of common stock at a per share price that is less than the conversion price then in effect, the conversion price shall be reduced to such lower price, subject to certain exceptions. The Company is prohibited from effecting a conversion of the share of Series E Preferred Stock to the extent that, as a result of such conversion, such holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series E Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's share of Series E Preferred Stock, but not in excess of beneficial ownership limitations. The shares of Series E Preferred Stock bear no interest.

On August 22, 2016, when the Company closed on the August 2016 Public Offering, the current Series E Preferred Stock conversion price of $16.65 per share was reduced to $14.43 per share under the terms of the Series E Certificate of Designations, resulting in an increase in the number of shares of common stock to 173,251 that the Series E Preferred Stock may be converted into.

In the event of a liquidation, dissolution or winding up of the Company, each share of Series E preferred stock will be entitled to a

per share preferential payment equal to the stated value. There is no further adjustment required by the Series E Certificate of Designations in the event of an offering of shares below $14.43 per share by the Company.

**Series F Preferred Stock**

As of December 31, 2017, and 2016, there were no shares and 665,281 shares, respectively, of Series F Preferred Stock issued and outstanding. Shares outstanding as of December 31, 2016 were convertible into 221,761 shares of common stock. These shares were exchanged for Series L Preferred Stock in connection with the Exchange Agreement.

On August 16, 2016, we filed a Certificate of Designations, Preferences and Rights of the 0% Series F Convertible Preferred Stock with the Delaware Secretary of State, designating 1,559,252 shares of preferred stock as 0% Series F Preferred Stock. The shares of Series F Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of such Series F Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series F Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series F Preferred Stock is $4.81 and the initial conversion price is $14.43 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. In the event of a liquidation, dissolution or winding up of the Company, each share of Series F Preferred Stock was entitled to a per share preferential payment equal to the par value. All shares of the Company's capital stock were junior in rank to Series F Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company, except for the Company's Series D Preferred Stock and Series E Preferred Stock.

The holders of Series F Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series F Preferred Stock had the ability to participate on an "as converted" basis, with all dividends declared on the Company's common stock. In addition, if we had granted, issued or sold any rights to purchase our securities pro rata to all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the

granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series F Preferred Stock then held.

We were prohibited from effecting a conversion of the Series F Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series F Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of the Company and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series F Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series G Preferred Stock**

As of December 31, 2017, and 2016, there were no shares of our Series G Preferred Stock issued and outstanding. On May 19, 2017, we closed a public offering of 1,000,000 shares of newly designated 0% Series G Convertible Preferred stock; however, on October 17, 2017, these shares were exchanged for our Series L Preferred Stock in connection with the Exchange Agreement.

Pursuant to a Series G Preferred Stock Certificate of Designations, on May 15, 2017, we designated 5,000,000 shares of our blank check preferred stock as Series G Preferred Stock, par value of $0.01 per share. The shares of Series G Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of the of such Series G Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series G Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series G Preferred Stock is $1.75 and the initial conversion price is $5.25 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. The holder of a majority of the Series G Preferred Stock had the right to nominate a candidate for the Board, such right to expire on December 31, 2017.

In the event of a liquidation, dissolution or winding up of the Company, each share of Series G Preferred Stock was entitled to a per share preferential payment equal to the par value. All shares of our capital stock were junior in rank to Series G Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company, except for the Company's Series D Preferred Stock, Series E Preferred Stock and Series F Preferred Stock. The holders of Series G Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series G Preferred Stock were entitled to participate on an "as converted"basis, with all dividends declared on our common stock. In addition, if we had granted, issued or sold any rights to purchase our securities pro rata to all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series G Preferred Stock then held.

We were prohibited from effecting a conversion of the Series G Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series G Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of the Company and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series G Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series H Preferred Stock**

As of December 31, 2017 and 2016, there were no shares of our Series H Preferred Stock issued and outstanding. On May 3, 2017 we closed a private placement of 850 shares; however, these shares were exchanged for our Series L Preferred Stock in connection with the Exchange Agreement.

Pursuant to a Series H Preferred Stock Certificate of Designations, on May 3, 2017, we designated 2,000 shares of our blank check preferred

stock as Series H Preferred Stock, par value of $0.01 per share. The shares of Series H Preferred Stock were convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series H Preferred Stock, plus the base amount, if any, on such Series H Preferred Stock, as of such date of determination, divided by the conversion price.

The stated value of each share of Series H Preferred Stock was $1,000 and the initial conversion price was $5.25 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

In the event of a liquidation, dissolution or winding up of the Company, each share of Series H Preferred Stock was entitled to a per share preferential payment equal to the base amount. All shares of our capital stock were junior in rank to Series H Preferred Stock with respect to the preferences as to dividends, distributions and payments upon the liquidation, dissolution and winding-up of the Company other than Series A through G Preferred Stock. The holders of Series H Preferred Stock were entitled to receive dividends if and when declared by our Board of Directors. The Series H Preferred Stock holders were entitled to participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we granted, issued or sold any rights to purchase our securities pro rata to all our record holders of our common stock, each holder was entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series H Preferred Stock then held.

We were prohibited from effecting a conversion of the Series H Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series H Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder was entitled to vote on all matters submitted to stockholders of the Company, and would have had the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series H Preferred Stock, but not in excess of the beneficial ownership limitations.

**Series I Preferred Stock**

As of December 31, 2017 and 2016, there were 798,460 and no shares of our Series I convertible preferred stock (the "Series I Preferred Stock") issued and outstanding and convertible into 266,154 and no shares of our common stock, respectively.

Pursuant to a Series I Preferred Stock Certificate of Designations, on May 26, 2017, we designated 1,968,664 shares of our blank check preferred stock as Series I Preferred Stock, par value of $0.01 per share.

Each share of Series I Preferred Stock has a stated value of $0.01 per share. In the event of a liquidation, dissolution or winding up of the Company, each share of Series I Preferred Stock will be entitled to a per share preferential payment equal to the stated value. Each share of Series I Preferred Stock is convertible into one-third share of common stock. The conversion ratio is subject to adjustment in the event of stock splits, stock dividends, combination of shares and similar recapitalization transactions. The Company is prohibited from effecting the conversion of the Series I Preferred Stock to the extent that, as a result of such conversion, the holder beneficially owns more than 4.99%, in the aggregate, of the issued and outstanding shares of the Company's Common Stock calculated immediately after giving effect to the issuance of shares of Common Stock upon the conversion of the Series I Preferred Stock (the "Beneficial Ownership Limitation"), which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each share of Series I Preferred Stock entitles the holder to vote on all matters voted on by holders of Common Stock. With respect to any such vote, each share of Series I Preferred Stock entitles the holder to cast such number of votes equal to the number of shares of Common Stock such shares of Series I Preferred Stock are convertible into at such time, but not in excess of the Beneficial Ownership Limitation.

**Series J Preferred Stock**

As of December 31, 2017, and December 31, 2016, there were 773 and no shares of our Series J Preferred Stock issued and On August 14, 2017, the Company filed a Certificate of Designations, Preferences and Rights of the 0% Series J Convertible Preferred Stock with the Delaware Secretary of State, designating 3,400 shares of preferred stock as Series J Preferred Stock. The shares of Series J

Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series J Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series J Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series J Preferred Stock is $550 and the initial conversion price is $1.65 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

For so long as the holder has Series J Preferred Stock, if the Company sells, or is deemed to have sold, common stock, or common equivalent shares, for consideration per share less than the conversion price in effect immediately prior to the issuance (the "Lower Issuance Price"), then the conversion price in effect immediately prior to such issuance will be adjusted to the Lower Issuance Price, provided however the Lower Issuance Price shall not be less than $0.03.

The holders of Series J Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series J Preferred Stock shall participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we grant, issue or sell any rights to purchase our securities pro rata to all our record holders of our common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series J Preferred Stock then held.

We are prohibited from effecting a conversion of the Series J Preferred Stock to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series J Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series J Preferred Stock, substituting the consolidated closing bid price of the common stock on August 10, 2017 for the then-applicable conversion price, and not in excess of the beneficial ownership limitations.

The Company shall not be obligated to issue any shares of common stock upon conversion of the Series J Preferred Stock, and the holder of any shares of Series J Preferred Stock shall not have the right to receive upon conversion of any shares of the Series J Preferred Stock if the issuance of such shares of common stock would exceed the aggregate number of shares of common stock which the Company may issue upon conversion of the Series J Preferred Stock without breaching the Company's obligations under the rules or regulations of The NASDAQ Capital Market, which aggregate number equals 19.99% of the number of shares outstanding on the closing date, except that such limitation shall not apply in the event that the Company obtains the approval of its stockholders as required by the applicable rules of The NASDAQ Capital Market for issuances of common stock in excess of such amount. Such approval was obtained in October 2017.

Holders of Series J Preferred Stock will be entitled to a preferential payment of cash per share equal to the greater of 125% of the base amount on the date of payment or the amount per share had the holders converted such preferred shares immediately prior to the date of payment upon the liquidation, dissolution or winding up of the affairs of the Company, or a consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed.

**Series K Preferred Stock**

As of December 31, 2017 and 2016, there were 63,150 and no shares, respectively, of our Series K convertible preferred stock ("Series K Preferred Stock") issued and outstanding and convertible into 2,105,000 and no shares of our common stock, respectively. On August 14, 2017, the Company filed a Certificate of Designations, Preferences and Rights of the Series K Convertible Preferred Stock with the Delaware Secretary of State, designating 65,000 shares of preferred stock as Series K Preferred Stock. The shares of Series K Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series K Preferred Stock divided by the conversion price. The stated value of each share of Series K Preferred Stock is $0.01 and the ini tial

conversion price is $0.0003 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events.

The holders of Series K Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series K Preferred Stock shall participate on an "as converted" basis, with all dividends declared on our common stock. In addition, if we grant, issue or sell any rights to purchase our securities pro rata to all our record holders of our common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series K Preferred Stock then held. We are prohibited from effecting any conversion of the Series K Preferred Stock if the Company has not obtained shareholder approval for the full conversion of the Series J Preferred Stock and Series K Preferred Stock in accordance with the rules of The NASDAQ Capital Market or to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series K Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series K Preferred Stock, substituting the consolidated closing bid price of the common stock on August 10, 2017 for the then-applicable conversion price, and not in excess of the beneficial ownership limitations. Such approval was obtained in October 2017.

**Series L Preferred Stock**
As of December 31, 2017 and 2016, there were 58,000 and no shares of our Series L Preferred Stock issued and outstanding and convertible into 3,222,223 and no shares of our common stock, respectively. On October 16, 2017, we filed a Certificate of Designations, Preferences and Rights of the 0% Series LConvertible Preferred Stock (the "Series L Certificate of Designation") with the Delaware Secretary of State, designating 58,000 shares of preferred stock as Series L Preferred Stock. On October 18, 2017, we filed a Certificate of Correction to the Series LCertificate of Designation to include a sentence that was

inadvertently omitted. The shares of Series L Preferred Stock are convertible into shares of common stock based on a conversion calculation equal to the stated value of the Series L Preferred Stock, plus all accrued and unpaid dividends, if any, on such Series L Preferred Stock, as of such date of determination, divided by the conversion price. The stated value of each share of Series L Preferred Stock is $100 and the initial conversion price is $1.80 per share, each subject to adjustment for stock splits, stock dividends, recapitalizations, combinations, subdivisions or other similar events. The holders of Series L Preferred Stock will be entitled to receive dividends if and when declared by our Board of Directors. The Series L Preferred Stock shall participate on an "as converted"basis, with all dividends declared on our common stock. In addition, if the Company grants, issues or sells any rights to purchase its securities pro rata to all record holders of common stock, each holder will be entitled to acquire such securities applicable to the granted purchase rights as if the holder had held the number of shares of common stock acquirable upon complete conversion of all Series L Preferred Stock then held.

We are prohibited from effecting a conversion of the Series L Preferred Stock if the Company has not obtained stockholder approval for the full conversion of the Series L Preferred Stock in accordance with the rules of The NASDAQ Capital Market or to the extent that, as a result of such conversion, the holder would beneficially own more than 4.99% of the number of shares of common stock outstanding immediately after giving effect to the issuance of shares of common stock upon conversion of the Series L Preferred Stock, which beneficial ownership limitation may be increased by the holder up to, but not exceeding, 9.99%. Each holder is entitled to vote on all matters submitted to stockholders of the Company, and shall have the number of votes equal to the number of shares of common stock issuable upon conversion of such holder's Series L Preferred Stock, substituting the consolidated closing bid price of the common stock on October 13, 2017, for the then-applicable conversion price, and not in excess of the beneficial ownership limitations or limitations required by the rules and regulations of The NASDAQ Capital Market.

Holders of Series L Preferred Stock will be entitled to a preferential payment of cash per share equal to the greater of 100% of the base amount representing the sum of the stated value and any unpaid dividends, or the Base Amount, on the date of payment or the amount

per share had the holders converted such preferred shares immediately prior to the date of payment upon the liquidation, dissolution or winding up of the affairs of the Company, or a consolidation or merger of the Company with or into any other corporation or corporations, or a sale of all or substantially all of the assets of the Company, or the effectuation by the Company of a transaction or series of transactions in which more than 50% of the voting shares of the Company is disposed of or conveyed.

**Warrants Issued in Connection with April 2015 Private Placement**

As of December 31, 2017, there were no warrants outstanding in connection with the April 2015 Private Placement as all of the warrants expired on October 10, 2017. As of December 31, 2016, there were warrants outstanding to purchase 268,454 shares of common stock at $33.30 per share. The warrants priced at $33.30 and $6.00 per share were remaining from our private offering in March and April 2015 (the "April 2015 Private Placement") in which we sold $8,546,348 worth of units (the "Units"), net of $668,150 in issuance costs, of which $2,500,000 of the Units consisted of Series E Preferred Stock and the balance consisted of 553,424 shares of common stock, together with warrants to all investors to purchase 351,787 shares of common stock at $33.30 per share. Each Unit was sold at a purchase price of $16.65 per Unit. OPKO Health, Inc., the lead investor in the April 2015 Private Placement, purchased $2,500,000 worth of Units consisting all the shares of the Series E Preferred Stock.

In connection with the May 2017 Public Offering, the Company had agreed to amend the terms of a portion of the outstanding warrants, or warrants to purchase 108,108 shares of common stock that had an exercise price of $33.30 per share, such that the amended warrants shall have an exercise price of $6.00 per share and no cashless exercise feature, for those investors who made a certain minimum required investment to qualify for repricing. After the repricing, the stock price never reached above $6.00 in order for the warrants to be exercised prior to the expiration date of October 10, 2017.

**Warrants Issued in Connection with October 2015 Public Offering**

As of December 31, 2017 and 2016, there were warrants outstanding to purchase 56,307 shares of common stock at $29.31 per share in connection with a public offering on October 5, 2015. The warrants at $29.31 per share were issued in connection with our public offering on October 5, 2015, which consisted of 112,613 shares of common stock and warrants to purchase 56,307 shares of common stock, at an offering price of $2.71 per share. For every two shares of common stock sold, the Company issued one warrant to purchase one share of common stock. We received $2,750,000 in gross proceeds, before underwriting discounts and commissions and offering expenses totaling approximately $586,608.

The shares and warrants were separately issued and sold in equal proportions. The warrants are immediately exercisable, expire September 30, 2018, and have an exercise price of $29.31 per share. The warrants are not listed on any securities exchange or other trading market.

***

The Company is obligated to issue an aggregate of 350,000 options to certain employees and members of the Board, at a price not less than $6.00 per share, and 16,667 options to each other Board member at the current market price in connection with this offering. The options shall be issued pursuant to the Company's option plan and are subject to the requisite approvals and subject to availability under the plan. To the extent we need to increase the number of shares available under such plan, we will need the approval of our Board and Stockholders. All Board fees will be waived for 2017.

***

Additionally we granted the Lead Investor in the May 2017 Public Offering certain rights to approve future (i) issuances of our securities, (ii) equity or debt financings and (iii) sales of any development product assets currently held by us, subject to certain exceptions, if such securities are sold at price below $7.50 per share and for as long as the Lead Investor in the offering holds 50% or more of the shares of Series G Preferred Stock purchased by the Lead Investor in this offering (the "May 2017 Consent Right"). All other prior consent

rights of the Lead Investor have been superseded by the May 2017 Consent Right.

***

We conducted an evaluation of the effectiveness of internal control over financial reporting based on the framework in *Internal Control — Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2017, our internal controls over financial reporting were effective.

31.    The statements referenced above in ¶¶ 23 were materially false and/or misleading when made because Defendants failed to disclose: (1) that the Company's internal controls over financial reporting were materially weak and deficient; (2) that the Company had incorrectly calculated and reported beneficial ownership of MabVax shares and permitted improper influence or control over MabVax, and/or the Company's officers and directors by certain shareholders; and, (3) that, as a result of the foregoing, the Company's financial statements and Defendants' statements about MabVax's business, operations, and prospects, were materially false and misleading at all relevant times.

## THE TRUTH IS REVEALED

32.    On May 21, 2018, the Company filed an 8-K with the SEC disclosing more details regarding the SEC investigation into the Company and its officers and directors potential violation of federal securities laws, as well as an investigation

into potential violations of securities laws by various holders of the Company's

securities. The Company stated in relevant part:

> We believe the SEC is investigating (i) potential violations by the Company and its officers, directors and others of Section 10(b) of the Securities and Exchange Act of 1934, as amended (as amended, the "Exchange Act") and Section 17(a) of the Securities Act of 1933, as amended (as amended, the "Securities Act"); and (ii) potential violations by multiple holders of our preferred stock of the reporting and disclosure requirements imposed by Section 13(d) of the Exchange Act and pursuant to Schedules 13D and 13G. We further believe the SEC Investigation pertains to our relationships with multiple of those holders of our preferred stock, including (i) the circumstances under which those stockholders invested in the Company and whether they have acted as an undisclosed group in connection with their investment; (ii) the manner with or in which those stockholders may have sought to control or influence the Company and its leadership since their respective investments (and the extent to which those efforts to control or influence have been successful); and (iii) our prior disclosures regarding the control of the Company and beneficial ownership of our common and preferred stock included in our registration statements filed in 2017 and 2018 and in our Exchange Act reports. In light of the SEC Investigation, we have also reviewed facts and circumstances related to our recently completed May 2018 offering and publicly available information concerning certain of our stockholders' relationships with other registrants.
>
> We have cooperated with the SEC in connection with the SEC Investigation, and our Board of Directors has appointed a Special Committee comprised of independent members of our Board of Directors to supervise the Company's review of the matters believed to be under investigation. However, we cannot predict when the SEC Investigation will conclude, nor whether it will conclude in a manner adverse to the Company, any of its directors and officers, or its current or former stockholders. We also cannot predict, how the SEC Investigation or any related matters may impact how the Company is perceived by the market, potential partners and potential investors in our securities. We do not believe that the SEC would declare effective

any registration statements registering our securities effective during the pendency of the SEC Investigation.

Historically, we have calculated and reported beneficial ownership in reliance upon the accuracy of the beneficial ownership reporting of our stockholders, including reports filed on Schedules 13D and 13G and information provided by these stockholders directly to us. We have similarly relied on the accuracy of stockholder-reported beneficial ownership when effecting conversions of shares of preferred stock. The SEC Investigation and our review of the matters under investigation (including information learned recently) has raised questions about the accuracy of those reports by those holders, including their past disclaimers of having not acted as a group with respect to their investment in the Company. If certain stockholders have indeed acted as a group, their respective beneficial ownership interests should have been aggregated and reported in the aggregate in our prior beneficial ownership disclosures. If their holdings should have been so aggregated, then, due to the provisions of our organizational documents regarding the conversion limitations applicable to certain holders of our preferred stock, shares of our common stock may have been issued in violation of our organizational documents. If shares of our common stock were issued in violation of our organizational documents, then the number of shares of our outstanding common stock previously reported in our financial statements, registration statements and Exchange Act Reports may be inaccurate. Further, figures reported and included in our financial statements, registration statements and Exchange Act Reports in reliance on the number of our outstanding shares of common stock, including, but not limited to, our loss per share figures, may also be inaccurate. We are also reviewing our internal and disclosure controls.

33.    On this news the Company's shares fell $0.41 per share or over 23%, to

close on May 21, 2018 at $1.36 per share.

**NO SAFE HARBOR**

34.     Most of the false and misleading statements related to existing facts or conditions, and the Safe Harbor provisions have no applicability to such statements. To the extent that known trends should have been included in the Company's financial reports prepared in accordance with GAAP, they too are excluded from the protection of the statutory Safe Harbor.  15 U.S.C. §78u-5(b)(2)(A).

35.     MabVax's "Safe Harbor" warnings accompanying its reportedly forward-looking statements issued during the Class Period were also ineffective to shield those statements from liability.   Defendants Hansen and Hanson are liable for any false or misleading forward-looking statements because, at the time each forward-looking statements was made, the speaker knew the forward-looking statements was false or misleading and the forward-looking statements was authorized and/or approved by an executive officer and/or director of MabVax who knew that the forward-looking statements was false.   In addition, the forward-looking statements were contradicted by existing, undisclosed material facts that were required to be disclosed so that the forward-looking statements would not be misleading.  Finally, most of the purported "Safe Harbor" warnings were themselves misleading because they warned of "risks" that had already materialized or failed to provide meaningful disclosures of the relevant risks.

## ADDITIONAL SCIENTER ALLEGATIONS

36.    As alleged herein, Defendants Hansen and Hanson acted with scienter in that each knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.   As set forth elsewhere herein in detail, Defendants Hansen and Hanson, by virtue of their receipt of information reflecting the true facts regarding MabVax, their control over, and/or receipt of modification of MabVax's allegedly materially misleading misstatements and/or his associations with the Company which made them privy to confidential proprietary information concerning MabVax, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD-ON-THE-MARKET DOCTRINE

37.    At all relevant times, the market for MabVax's common stock was an efficient market for the following reasons, among others:

(a)    MabVax's stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)    The Company had approximately 8,961,840 shares of common stock issued and outstanding as of April 2, 2018;

(c)    as a regulated issuer, MabVax filed periodic public reports with the SEC;

(d)    MabVax regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services, the Internet and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    MabVax was followed by many securities analysts who wrote reports that were distributed during the Class Period.  Each of these reports was publicly available and entered the public marketplace; and

(f)    unexpected material news about MabVax was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

38.    As a result of the foregoing, the market for MabVax common stock promptly digested current information regarding MabVax from publicly available sources and reflected such information in MabVax's stock price.   Under these circumstances, all purchasers of MabVax common stock during the Class Period suffered similar injury through their purchase of MabVax common stock at artificially inflated prices, and a presumption of reliance applies.

## LOSS CAUSATION

39.    During the Class Period, as detailed herein, Defendants Hansen and Hanson made false and misleading statements, and omitted material information,

concerning MabVax's business fundamentals and financial prospects and engaged in a scheme to deceive the market.

40.     By artificially inflating and manipulating MabVax's stock price, Defendants Hansen and Hanson deceived Plaintiff and the Class and caused them losses when the truth was revealed.  As a result of their purchases of MabVax securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## CLASS ACTION ALLEGATIONS

41.     This is a securities class action on behalf of all individuals and/or entities that purchased or otherwise acquired the securities of MabVax between June 30, 2014 and May 18, 2018, inclusive, excluding Defendants Hansen and Hanson (the "Class").  Also excluded from the Class are officers and directors of the Company as well as their families and the family of Defendants Hansen and Hanson.  Class members are so numerous that joinder of them is impracticable.

42.     Common questions of law and fact predominate and include whether Defendants Hansen and Hanson: (a) violated the Exchange Act; (b) omitted and/or misrepresented material facts; (c) knew or recklessly disregarded that their statements were false; (d) artificially inflated the price of MabVax common stock; and (e) the extent of and appropriate measure of damages.

43.     Plaintiff's claims are typical of those of the Class.  Prosecution of individual actions would create a risk of inconsistent adjudications.  Plaintiff will

adequately protect the interests of the Class.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## COUNT I

### For Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

44.    Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

45.    Throughout the Class Period, Defendants MabVax, Hansen and Hanson, in pursuit of their scheme and continuous course of conduct to inflate the market price of MabVax common stock, had the ultimate authority for making, and knowingly or recklessly made, materially false or misleading statements or failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading.

46.    During the Class Period, Defendants MabVax, Hansen and Hanson, and each of them, carried out a plan, scheme, and course of conduct using the instrumentalities of interstate commerce and the mails, which was intended to and, throughout the Class Period did: (a) artificially inflate and maintain the market price of MabVax common stock; (b) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (c) cause Plaintiff and other members of the Class to purchase MabVax common stock at inflated prices; and (d) cause them losses when the truth was revealed.   In furtherance of this unlawful scheme, plan

and course of conduct, Defendants MabVax, Hansen and Hanson took the actions set forth herein, in violation of §10(b) of the Exchange Act and Rule 10b-5, 17 C.F.R. §240.10b-5.

47.    In addition to the duties of full disclosure imposed on Defendants MabVax, Hansen and Hanson as a result of their affirmative false and misleading statements to the investing public, these Defendants had a duty to promptly disseminate truthful information with respect to MabVax's operations and performance that would be material to investors in compliance with the integrated disclosure provisions of the SEC, including with respect to the Company's revenue and earnings trends, so that the market price of the Company's securities would be based on truthful, complete and accurate information.  SEC Regulations S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.).

48.    Defendants MabVax, Hansen and Hanson had actual knowledge of the misrepresentations and omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were either known or readily available to them.

49.    As a result of the dissemination of the materially false and misleading information and failure to disclose material facts as set forth above, the market price of MabVax common stock was artificially inflated during the Class Period.  In ignorance of the fact that the market price of MabVax common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements

made knowingly or with deliberate recklessness by Defendants MabVax, Hansen and Hanson, or upon the integrity of the market in which the shares traded, Plaintiff and other members of the Class purchased MabVax stock during the Class Period at artificially high prices and, when the truth was revealed, were damaged thereby.

50.   Had Plaintiff and the other members of the Class and the marketplace known of the true facts, which were knowingly or recklessly concealed by Defendants MabVax, Hansen and Hanson, Plaintiff and the other members of the Class would not have purchased or otherwise acquired their MabVax shares during the Class Period, or if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

51.   By virtue of the foregoing, Defendants MabVax, Hansen and Hanson have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. 17 C.F.R. §240.10-5.

## COUNT II

### For Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

52.   Plaintiff repeats and realleges the above paragraphs as though fully set forth herein.

53.   Defendants Hansen and Hanson had control over MabVax and made the material false and misleading statements and omissions on behalf of MabVax within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of

their executive positions and stock ownership, as alleged above, Defendants Hansen and Hanson had the power to influence and control and did, directly or indirectly, influence and control the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading. Defendants Hansen and Hanson were provided with or had unlimited access to the Company's internal reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to or shortly after these statements were issued, and had the ability to prevent the issuance of the statements or cause them to be corrected.

54. In particular, Defendants Hansen and Hanson had direct involvement in and responsibility over the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein.

55. By reason of such wrongful conduct, Defendants Hansen and Hanson are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of Defendants Hansen's and Hanson's wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.    Awarding such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


DATED:  August 3, 2018          **GLANCY PRONGAY & MURRAY LLP**


By: *s/ Lesley F. Portnoy*
Lionel Z. Glancy
Robert V. Prongay
Lesley F. Portnoy
Charles H. Linehan
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160
Email: lportnoy@glancylaw.com

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**LAW OFFICES OF HOWARD G. SMITH**
Howard G. Smith
3070 Bristol Pike, Suite 112
Bensalem, PA 19020
Telephone: (215) 638-4847
Facsimile: (215) 638-4867

*Attorneys for Plaintiff*

**SWORN CERTIFICATION OF PLAINTIFF**

**MABVAX THERAPEUTICS HOLDINGS, INC. SECURITIES LITIGATION**

I, Jerry Vinson individually, and/or in my capacity as trustee and/or principal for accounts listed on Schedule A, certify that:

1.     I have reviewed the Complaint and authorize its filing and/or the filing of a Lead Plaintiff motion on my behalf.

2.     I did not purchase the MabVax Therapeutics Holdings, Inc. securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action arising under this title.

3.     I am willing to serve as a representative party on behalf of a class and will testify at deposition and trial, if necessary.

4.     My transactions in MabVax Therapeutics Holdings, Inc. securities during the Class Period set forth in the Complaint are as follows:

        (See attached transactions)

5.     I have not sought to serve, nor served, as a representative party on behalf of a class under this title during the last three years, except for the following:

6.     I will not accept any payment for serving as a representative party, except to receive my pro rata share of any recovery or as ordered or approved by the court, including the award to a representative plaintiff of reasonable costs and expenses (including lost wages) directly relating to the representation of the class.

I declare under penalty of perjury that the foregoing are true and correct statements.

8/3/2018
_____
Date

_DocuSigned by:_
_Jerry Venson_
FE9354B5D8AF4C6...
_____
Jerry Vinson

**Jerry Vinson's Transactions in MabVax Therapeutics Holdings, Inc. (MBVX)**

| Date | Transaction Type | Quantity | Unit Price |
|------|------------------|----------|------------|
| 9/21/2016 | Bought | 1,100 | $4.8445 |
| 9/21/2016 | Bought | 3,900 | $4.8500 |